**E-FILED**
Tuesday, 07 June, 2016  08:42:13 AM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **SATINA JO BRADLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 15-3150** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Plaintiff Satina Jo Bradley appeals from the denial of her application for Social Security Disability Insurance Benefits under Title II of the Social Security Act.  42 U.S.C. §§ 416(i), 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).

Bradley has filed a Motion for Summary Judgment and Memorandum of Law in Support of Remand/Vacate of Decision Denying Disability (d/e 18).  Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 21).  For the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

## I. INTRODUCTION

On May 8, 2012, Bradley filed an application for disability insurance benefits alleging a disability onset date of February 28, 2011.  Bradley acquired sufficient quarters of coverage to remain insured through December 31, 2016.  See Certified Transcript of Proceedings before the Social Security Administration (R.) (d/e 14), ALJ Decision at 17.  Bradley alleged disability due to bilateral Meniere's disease, dizziness, depression, anxiety, generalized myalgia, weakness, pain, and fatigue.

The Social Security Administration (SSA) denied the application initially on August 30, 2012 and again on reconsideration on April 1, 2013.  (R. 107, 115).  Bradley appeared with counsel at an administrative hearing on November 15, 2013, and provided testimony.  On January 10, 2014, the ALJ found Bradley was at all relevant times capable for performing her past work as a cashier and was therefore not disabled.  R. 27.  Alternatively, the ALJ found that other jobs existed in the national economy that Bradley could perform.  R. 29.

The appeals council denied Bradley's request for review on March 9, 2015 , and Bradley now seeks judicial review of the ALJ's

decision, which stands as the final decision of the Commissioner. R. 1-3.

## II. BACKGROUND

The Court has reviewed the entire record but sets forth only a summary of the evidence to put Bradley's arguments in context. In this appeal, Bradley primarily challenges the ALJ's findings regarding her Meniere's Disease and the ALJ's failure to give controlling weight to the opinion of Bradley's treating physician, Dr. Daniel O'Brien.

Bradley was born on September 5, 1966 and was 47 years old at the time of the ALJ's decision. She is a high school graduate, and completed one year of vocational college. R. 41. She previously worked as a cashier, customer service representative, and an office manager. Bradley's last full-time work as a customer service representative at Forsythe Insurance ended in February 2011 when she was discharged because of a "bad attitude." See R. 156, 200, 219, 235.

Bradley was diagnosed with Meniere's Disease in July 2003 and received treatment at the Shea Ear Clinic in Memphis, Tennessee until 2011. Bradley stopped going to the Shea Ear Clinic

because she no longer had insurance and the benefits of the procedures the Clinic performed only lasted a short while.  R. 49.

Dr. O'Brien, a family practitioner, has treated Bradley since 1998.  The medical records reflect that Bradley frequently saw Dr. O'Brien for depression and anxiety, and he prescribed medication. The records prior to and after February 2011 (the alleged date of onset) show various levels of depression, stress, fatigue, and anxiety.  At times, the medical records reflect Bradley appeared depressed and tearful.  Dr. O'Brien's treatment notes sometimes contain Bradley's reports of dizziness, ear pain, or ear fullness.

Dr. O'Brien completed two documents entitled "Meniere's Disease Residual Functional Capacity Questionnaire," one dated May 29, 2013 and one dated October 1, 2013.  In the May 2013 Questionnaire, Dr. O'Brien noted that Bradley did not have progressive hearing loss (noting that Bradley's hearing had improved), suffered vertigo, nausea/vomiting, and fatigue/exhaustion, and that she had daily Meniere's attacks of brief duration.  R. 477-78.  Dr. O'Brien stated that neck extension and bending over precipitated Bradley's Meniere's attacks and that walking around made the attacks worse.  R. 478-79.  The post-

attack manifestation was exhaustion.  R. 479.  Dr. O'Brien
expressed the opinion that during the times Bradley had an attack,
Bradley could not perform even basic work activities and would
need a break from the workplace.  R. 480.  She would also need to
take unscheduled breaks, although Dr. O'Brien did not indicate
how often or for how long.  Id.  Dr. O'Brien believed that Bradley
could tolerate moderate work stress and that her impairment was
likely to produce good and bad days.

In the October 2013 Questionnaire, Dr. O'Brien did not
indicate whether Bradley had hearing loss but wrote, "Slowly
progressive, initially [left] hearing loss, now bilateral."  R. 488.  Dr.
O'Brien marked the following symptoms as being associated with
Bradley's Meniere's attacks:  vertigo, nausea/vomiting,
photosensitivity, sensitivity to noise, mood changes, mental
confusion/inability to concentrate, and fatigue/exhaustion.  R. 489.
He again identified her attacks as daily and of brief duration but
this time stated that the precipitating factors included "computer
monitor, rapid movements—bend, extend, standing, turning;
darkness (disoriented)."  R. 489.  Bright lights, noise, and moving
around made the attacks worse.  R. 489.  Dr. O'Brien identified

lying in a dimly lit room, staring, and focusing on an object as things that possibly improve symptoms.  Dr. O'Brien marked the following as post-attack manifestations:  confusion, exhaustion, irritability, severe headaches and he wrote in "weakness."  R. 490. According to Dr. O'Brien, the manifestations last up to two days and Bradley has to stay in bed because she is fatigued and off-balance.  R. 490.

Although Dr. O'Brien did not identify in the May 2013 Questionnaire any side effects Bradley suffered due to her medications, he identified in the October 2013 Questionnaire that Bradley suffered from poor concentration, poor focus, "cloudy," fatigue, and sleepiness as side effects.  R. 491.  Dr. O'Brien again indicated that, during an attack, Bradley would be precluded from performing even basic work activities and would need a break from the workplace.  R. 491.  She would also need to take unscheduled breaks during an 8-hour work day.  In the October 2013 Questionnaire, Dr. O'Brien indicated this would occur "2-3 days" and that Bradley would need "2-3 days" to rest before returning to work.  Bradley would also need to lie down or sit quietly during such a break.  R. 491.  Dr. O'Brien indicated that Bradley was

incapable of even a low stress job because "stress intensifies anxiety, depression, confusion." R. 491. Bradley's impairments were likely to produce good and bad days. R. 491. Bradley would be absent from work every 2 to 3 days and more than four days a month. R. 491. Dr. O'Brien also wrote: "cannot drive after dark & cannot drive long distances; infrequently drives to dr's office, post office if not bothering her that day." R. 492.

Dr. O'Brien also submitted a Residual Functional Capacity Form dated September 30, 2013. (R. 482). Dr. O'Brien stated that Bradley suffered from Meniere's disease, fatigue, confusion, severe depression, anxiety, and fibromyalgia. R. 482. Bradley's impairments prevented her from standing or sitting upright for six to eight hours. R. 483. Bradley could only stand for 15 to 30 minutes due to her fatigue, aches, and dizziness. Id. Bradley's disability or impairment also required her to lie down during the day. R. 484. She could only walk two to three blocks. Id. Bradley could rarely reach above her shoulders, reach down to waist level, reach down toward the floor, carefully handle objects, or handle with fingers. She could lift and carry less than five pounds

regularly.  R. 484.  Bradley could not squat or kneel, or turn her neck.  R. 485.

Dr. O'Brien opined that, given Bradley's impairments, Bradley could not resume work because she had not worked for 2 1/2 years and her symptoms and resultant disability have progressed.  R. 485.  Dr. O'Brien believed Bradley was permanently disabled.  R. 485.

On August 15, 2012, Dolores Trello, Psy.D. performed a mental status examination of Bradley at the request of the Social Security disability adjudicator (R. 452).  Dr. Trello concluded that, on Axis I, Bradley had dysthymic disorder and generalized anxiety disorder, had a Global Assessment of Functioning (GAF) of 50.[1]  Dr. Trello also concluded that Bradley had "serious impairment in interpersonal and vocational functioning."  R. 456.

Dr. Michael S. Trieger, Psy.D., a consultative examiner, conducted a psychological evaluation of Bradley in February 2013.

---

[1] The Global Assessment of Functioning "is a numerical scale (1 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults[.]" https://www.mentalhelp.net/articles/global-assessment-of-functioning/ (last visited June 6, 2016).  A score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.

Dr. Trieger concluded that, on Axis 1, Bradley suffered from major depressive disorder and panic disorder (by claimant report) and had a global assessment functioning of 49.  R. 476.

The Residual Functional Capacity Assessments prepared on initial review and reconsideration provided that Bradley had postural limitations due to her dizziness and could never climb ladders, ropes, or scaffolds, and could only occasionally climb stairs and ramps.  <u>See</u> R. 82-83, 98-99.  Bradley should also avoid even moderate exposure to hazards due to dizziness.  R. 83, 99.

The Mental Residual Functional Capacity Assessment prepared on initial review concluded that Bradley had no significant mental limitations in understanding and memory.  R. 83-85. Bradley had moderate limitations in the ability to carry out detailed instructions and interact appropriately with the general public. Bradly did not have significant mental limitations in adaptation. Bradley was mentally capable of performing short and simple tasks in a routine schedule with reasonable rest periods and limited interaction with the general public.  On reconsideration, the psychological consultant also noted that Bradley should have work assignments requiring no contact with the public and minimal

contact with co-workers and supervisors.  R. 102.  The consultant found no medical evidence of record that Bradley had significant impairment in learning the way and traveling to a work site.  R. 102.

### III. ADMINISTRATIVE HEARING

A hearing was held on November 15, 2013.  Bradley testified that she took the following medication: alprazolam for anxiety; levothyroxine for her thyroid; potassium CI for low potassium; hydrochlorothiazide (water pill) for Meniere's Disease; Prozac for depression; prednisone for occasions when Meniere's "gets really out of hand;" amitriptyline for anxiety; and meclizine for dizziness and nausea. R 43-44.  Bradley did not believe that the antidepressants were effective.  R. 44.  She testified that the anxiety medication works.  R. 45.  Side effects from the medications include fatigue, diarrhea, and upset stomach. R. 45.

Bradley drives 40 miles or less a week and only during the day.  R. 46; r. 54 ("I haven't driven at night for probably five or six years.").  She testified that she can take care of her own personal hygiene needs with the exception of washing her hair because she cannot tilt her head forward or backward.  R. 46.

She occasionally prepares meals at home but not on the stove. It is difficult for her to lift wet clothes out of the washing machine because her arms and body are weak.  R. 47.

Bradley testified she has been seeing Dr. O'Brien since 1998 for major depression, fibromyalgia, low potassium, and anxiety.  R. 48.  When Bradley's attorney asked if Dr. O'Brien treated her for Meniere's Disease, Bradley testified, "Along with him [Dr. O'Brien] being able to prescribe the water pill for me, that would be the only aspect."  R. 48.  Bradley explained that she would normally go to the Shea Ear Clinic in Tennessee where they specialize in Meniere's Disease.  R. 48.  However, she had not been to the Shea Ear Clinic for three to four years because she no longer has health insurance and the procedures the Clinic performed only lasted a short while.  R. 49.  Bradley has, however, discussed with Dr. O'Brien how Meniere's affects her.  R. 50.

Bradley testified that her Meniere's is constant and that "[e]very waking minute I feel like I am trying to keep things balanced."  R. 51.  Meniere's Disease makes her nauseated and fall down.  She also has hearing loss.  R. 51.  She has "episodes" of Meniere's Disease daily but the episodes only last a few minutes.  R.

52.  Then she has to lie down, sit down, or take meclizine "to try to get back to an even place."  R. 52.  She has to lie down for 10 to 15 minutes, unless she has a full-blown attack.  R. 52.  If she has a full-blown attack, she goes to the emergency room, goes home, and is in bed for a number of days.  R. 52.  In the last six months, she went to the emergency room once for a fall she had in the house.  R. 52,73.

When asked what she was doing in 2003 when she was diagnosed that she cannot do now, Bradley testified "[p]retty much everything. . . bending over; standing up; reaching" R. 52-53.  She cannot ride a bike or go swimming.  She cannot hear her cell phone.  Her coordination is "horrendous."  She has a hard time using her hands.  R. 53.  She has problems coming back up after bending over.  She does not wear shoelaces in her shoes because she cannot bend over to tie them.  R. 53-54.

Bradley testified she cannot sit upright for an extended length of time because she gets tired.  Lights flickering bother her.  R. 54. She seldom uses a computer because looking at anything repetitive (like changing screens or a train moving on a train track)

bothers her and she will eventually throw up.  R. 55.  She can walk one or two blocks without taking a break.  R. 56.

Bradley testified that she has problems moving her head from left to right and up and down.  She has not had a good day in years.  On a less severe day, she sometimes lies in bed and cries but other times she will get up and try to do something around the house.  R. 57.  She testified that today was a bad day because she has high anxiety, which intensifies the depression and does not help the Meniere's Disease at all.  R. 57.

Bradley takes naps once or twice a day.  If she is having a severe day, she takes meclizine, which "knocks her out."  R. 58.  She has learned that there is no medicine for dizziness.  The medicine she takes puts her to sleep so she does not feel the dizziness.  R. 58.

The longest she can sit in an upright position before she has to stand up is 30 minutes.  R. 63.  Bradley testified that sitting during the hearing caused her hips to hurt, which she believed was part of her fibromyalgia.  R. 63.  Dr. O'Brien diagnosed her with fibromyalgia based on Bradley's complaints and not being able to figure out anything else that was causing the pain.  R. 64.  The only

test he performed was a bone density test, which was normal.  She did not see a rheumatologist because she does not have health insurance.  R. 64.   When the ALJ asked her if she was telling him that she could afford to smoke but not go to the doctor, Bradley testified that she was trying to quit smoking.  R. 65.  She paid $132 a month to see Dr. O'Brien and spends $150 to $200 a month on prescriptions.  R. 65.  Bradley testified that she had been seeing O'Brien monthly, explained all of her problems to Dr. O'Brien, and that Dr. O'Brien's treating source statement was based on his observations of her.  R. 65-66.  Bradley confirmed that everything Dr. O'Brien put on the forms was based on things she had told him in previous visits about her condition.  R. 67.

The ALJ posed several hypotheticals to the vocational expert, Bob Hammond, to determine whether an individual of the same age, education, and experience as Bradley could perform past relevant work or other work in the national economy with various limitations.  R. 69-72.

## IV. THE DECISION OF THE ALJ

On January 10, 2014, the ALJ issued his decision.  R. 17-29. The ALJ followed the five-step analysis set forth in Social Security

Administration Regulations.  20 C.F.R. § 404.1520.  Step 1 requires

that the claimant not be currently engaged in substantial gainful

activity.  20 C.F.R. § 404.1520(b).  If true, Step 2 requires the

claimant to have a severe impairment.  20 C.F.R. § 404.1520(c).  If

true, Step 3 requires a determination of whether the claimant is so

severely impaired that she is disabled regardless of her age,

education and work experience.  20 C.F.R. § 404.1520(d).  To meet

this requirement at Step 3, the claimant's condition must meet or

be equal to the criteria of one of the impairments specified in 20

C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §

404.1520(d).  If the claimant is not so severely impaired, the ALJ

proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her

prior work considering her age, education, work experience, and

Residual Functional Capacity.  20 C.F.R. § 404.1520(e) and (f).  If

the claimant cannot return to her prior work, then Step 5 requires a

determination of whether the claimant is disabled considering her

RFC, age, education, and past work experience.  20 C.F.R. §§

404.1520(g), 404.1560(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.

The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. § 404.1512; <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011).

The ALJ found that Bradley met her burden at Steps 1 and 2. Bradley had not engaged in substantial gainful activity since February 28, 2011 and she had the severe impairments of Meniere's disease and depression.  R. 19.  The ALJ concluded that while Bradley alleged fibromyalgia, there was no definitive diagnosis within the medical evidence of record made by a specialist..  R. 20. The ALJ also found that Bradley received treatment for anxiety but that Bradley testified that her anxiety was stable and that was documented in the medical evidence of record.  R. 20.

At Step 3, the ALJ found that none of Bradley's impairments or combination of impairments met or medically equaled the severity of a Listing.  R. 20.

Between Steps 3 and 4, the ALJ found that Bradley had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional climbing of ramps, ladders, and stairs; no climbing ropes or scaffolds; because of all the claimant's mental impairments and symptoms combined, the claimant may during times of symptoms [and] exacerbations have moderate limitations in concentration, persistence, and/or pace when attempting complex or detailed tasks, so the claimant is limited to jobs without complex or detailed job processes that can be learned in 120 days or fewer.

R. 22.  In explaining the RFC finding, the ALJ summarized the Function Reports, testimony, and the third-party Function Report completed by Bradley's boyfriend, David Kemp.  R. 22-24.  The ALJ then found that Bradley's testimony about the "intensity, persistence and limiting effects" of her symptoms not credible.   R. 24.

In finding Bradley not entirely credible, the ALJ noted that there was evidence that the claimant had stopped working for reasons not necessarily related to the allegedly disabling impairments, namely for having a "bad attitude." R. 24.  With regard to the Meniere's Disease, the ALJ concluded that the evidence of record did not support a finding that Bradley's symptoms occurred with such severity and frequency as to prevent

Bradley from engaging in substantial gainful work activity. The ALJ found that Bradley's allegedly disabling impairment was present at approximately the same level of severity prior to the alleged onset date. R. 24. The fact that the physical impairment did not prevent Bradley from working prior to the onset date "strongly suggest that it would not currently prevent work." R. 24. The ALJ also found it less than credible that Bradley allegedly experiences sudden, frequent bouts of dizziness and loss of balance but is still willing to drive, although she admittedly did not drive long distances. R. 24. The ALJ concluded that, taken as a whole, the medical evidence did not suggest that Bradley experienced disabling functional limitations because of her Meniere's Disease. R. 24.

Similarly, the ALJ found that the total evidence of record did not demonstrate that Bradley's depression was so severe that it causes mental functional limitations that prevent Bradley from engaging in all substantial gainful activity. The ALJ cited the August 2012 mental status examination and the February 2013 consultative psychological evaluation. The ALJ also noted that while Bradley frequently claimed to be depressed throughout the period under consideration, the objective evidence did not

demonstrate that her depression caused disabling limitations in mental functioning.  R. 25.

The ALJ also noted that Bradley had a long and established history of treatment for depression.  The ALJ found: "Yet [Bradley] never sought or received treatment from a specialist for her depression during the entire period under consideration . . . as one might expect of a person with an allegedly disabling mental impairment."  R. 25.  Moreover, the ALJ stated that all of Bradley's treatment has been rendered by a general practitioner.  As of November 2013, Bradley still had not sought counseling with the Springfield Mental Health Center as recommended to her by a nurse practitioner.  The ALJ found this called into question the severity of Bradley's alleged depression.  R. 25.

The ALJ also considered the opinion evidence.  The ALJ noted that the residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Service supported a finding of not disabled.  R. 25 1A, 3A.  The ALJ noted that the physicians were non-examining and did not deserve as much weight as those of examining or treating physicians but found

the opinions did deserve some weight where there existed a number of other reasons to reach similar conclusions.  R. 25

The ALJ also considered the two Meniere's Disease Residual Functional Capacity Questionnaires completed by Dr. O'Brien. R. 25-26.  The ALJ noted that the medical opinion of a treating physician is entitled to controlling weight so long as it is well-supported by medically acceptable clinical and laboratory techniques and not inconsistent with other substantial evidence in the record.  The ALJ found that Dr. O'Brien's opinion was not entitled to controlling weight for several reasons.

The ALJ concluded that, as a primary care physician, Dr. O'Brien's opinion appeared to rest in part on assessment of an impairment outside O'Brien's area of expertise.  Moreover, Dr. O'Brien's opinion appeared to rely in part on assessment of an impairment for which Bradley received no treatment from Dr. O'Brien.  Bradley testified she did not receive treatment from Dr. O'Brien for Meniere's Disease other than a prescription for her water pill.  R. 26.

In addition, the ALJ found that O'Brien relied heavily on the subjective report of symptoms or limitations provided by Bradley

and seemed to uncritically accept as true most, if not all, of what Bradley reported.  R. 26.  Dr. O'Brien's treatment notes documented Bradley's subjective complaints about her symptoms but "very little objective or clinical findings are recorded."  R. 26

The ALJ further found that Dr. O'Brien's opinion is without substantial support from other evidence in the record, which renders it less persuasive.  R. 26.  By way of example, the ALJ recognized the assertion of hearing problems by Bradley, Bradley's boyfriend, and Dr. O'Brien but noted a November 2013 examination recorded that Bradley was negative for hearing problems.  R. 26.  In addition, Dr. O'Brien's October 2013 Questionnaire found Bradley incapable of even "low stress" jobs despite finding, in the May 2013 Questionnaire, that Bradley was capable for high stress work—yet the treatment records do not document extreme changes in Bradley's mental function between those two months. [2]  R. 26.

---

[2] The record contains a February 4, 2014 letter from Dr. O'Brien indicating that this discrepancy was made in error.  See R. 704 ("I would like to address the issue of my patient's ability to work as there is a discrepancy on the Meniere's disease Residual Functional Capacity Questionnaire dated 5/29/13.  I erroneously indicated on this questionnaire that Ms. Bradley was 'capable of high stress work'.  This is not correct.  As you can tell from the questionnaire, this is contradictory with the other information provided.  On the updated Meniere's disease Residual Functional Capacity Questionnaire dated 10/1/13,

Additionally, Dr. O'Brien's October 2013 questionnaire found that
Bradley had post-attack manifestations that lasted for up to two
days and that she would need an unscheduled break every 2 to 3
days that would last 2 to 3 days but did not find those extreme
limitations existed when he completed his May 2013 Questionnaire.
R. 26-27.  The ALJ noted that Dr. O'Brien's treatment notes did not
document that Bradley experienced an increase in the frequency or
severity of attacks from her Meniere's Disease to support the
addition of such extreme limitations.  R. 27.  For all of those
reasons, the ALJ found Dr. O'Brien's opinions were not persuasive
and the ALJ gave Dr. O'Brien's opinions little weight.  The ALJ gave
significant weight to the findings of Dr. Trieger and Dr. Trello.  The
ALJ found that Bradley's adaptive functioning[3] did not suggest she
was disabled.

The ALJ concluded that, based on the medical evidence of
record, Bradley's testimony, and the record as a whole, Bradley has
retained the capacity to perform light work with minor

---

I indicated that my patient is 'incapable of even low stress work', which is the
correct response.").

[3] A deficit in adaptive functioning denotes an "inability to cope with the
challenges of everyday life."  Novy v. Astrue, 497 F.3d 708, 709 (7th Cir. 2007).

nonexertional limitations throughout the period under consideration.

At Step 4, the ALJ found that Bradley was capable of performing past relevant work as a cashier and telephone solicitor. The ALJ relied on the vocational expert's testimony. It is not clear that being a cashier is consistent with the state agency consultant's conclusion that Bradley should not work with the public. However, Bradley does not raise this argument, and the ALJ made an alternative finding that Bradley could perform other jobs in the national economy that do not appear to involve contact with the public.

Specifically, at Step 5, the ALJ also found that Bradley could perform a significant number of jobs in the national economy, namely eyewear assembler, semiconductor bonder, and circuit board screener. The ALJ relied on the testimony of the vocational expert and determined that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles. The ALJ concluded that Bradley was not disabled.

## V. LEGAL STANDARD

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971); Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).  This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder, 529 F.3d at 413-14.  The ALJ must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  In addition, the ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

## VI. ANALYSIS

On appeal, Bradley presents several challenges to the SSA's decision to deny her application for disability benefits.  Bradley

argues that the ALJ "committed reversible error by not adequately considering or addressing medical listing 2.07 in light of the clearly diagnosed Meniere's diagnosis." Pl. Mot. at 6 (d/e 18). Bradley asserts that the ALJ "was clearly making a medical decision" with regard to the Meniere's Disease diagnosis. Bradley asks that the case be remanded with instructions that a consultative medical doctor be called as a witness.

Under Step 3, a claimant must satisfy all of the criteria in the Listing to receive an award of disability insurance benefits. Rice v. Barnhart, 384 F.3d 363, 369 (7th Cir. 2004). The claimant bears the burden of proving her condition meets or equals each criterion of a listed impairment. Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004).

In this case, to satisfy Listing 2.07, Bradley had to prove that her condition met the following criteria:

> Disturbance of labyrinthine-vestibular function
> (including Meniere's disease), characterized by a history

of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:

A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and

B. Hearing loss established by audiometry.

20 C.F.R. Pt. § 404, Subpt. P App. 1, Listing 2.07.  The ALJ found:

The claimant's Meniere's Disease does not cause the claimant to [meet] or equal Listing 2.07, disturbance of labyrinthine-vestibular function (including Meniere's Disease), because it is not characterized by frequent attacks of balance disturbance, tinnitus, and progressive hearing loss with both a disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and hearing loss established by audiometry.

While brief, the Court finds that the ALJ discussed the listing by name and offered more than a perfunctory analysis of the listing. Moreover, Bradley does not point to any records to show how her impairment met the criteria under Listing 2.07.  In addition, while the Shea Ear Clinic records from 2005 reflect that Bradley had hearing loss in her left ear, ( See R. 388), a November 2010 medical record from the Shea Ear Clinic reflects that Bradley's hearing was good (R. 347).  In addition, a November 7, 2013 medical record form completed by a nurse practitioner at Physicians Group Associates

(Dr. O'Brien's office) indicated that Bradley was "negative for hearing problems." R. 644.

Bradley also argues that the ALJ should have consulted a medical expert to determine whether Bradley's impairment met or equaled a listing. In support thereof, Bradley cites Barnett v. Barnhart, 381 F.3d 664, which found that the ALJ erred, in part, by failing to consult a medical expert regarding whether Listing 11.03 was equaled.

"Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." Barnett, 381 F.3d at 670. However, the signature of a State agency medical or psychological consultant on a Disability Determination and Transmittal Form (SSA-831-U5) or other documents on which medical and psychological consultants record their findings can satisfy the requirement to receive expert opinion evidence into the record. See SSR 96-6p.

In Barnett, the Seventh Circuit noted that the record did not contain an SSA-831-U5 or other form that would "satisfy the ALJ's duty to consider an expert's opinion on medical equivalence." Barnett, 381 F.3d at 671. In contrast here, the record contains two

Disability Determination and Transmittal Forms (R. 89, R. 105).
Although the forms in this case are form SSA-831-C3 and not form
SSA 831-U5, the two forms appear to be the same and, in any
event, the SSA-831-C3 form is an "other document" contemplated
by SSR 96-6p as sufficient to constitute expert evidence in the
record.  See Dailey v. Colvin, No. 1:14-CV-00294-SEB, 2015 WL
331859, at *2 n. 2 (S.D. Ind. Jan. 21, 2015) (finding that SSA-831-
C3 forms were the same as SSA-831-U5 forms and, even if not the
same, "the ALJ still not err in relying on the state agency reviewers
disability determination and transmittal forms as they are other
documents that consider the question of medical equivalence").  The
record also demonstrates that the ALJ relied on the State agency
reviewers' opinions in which they opined that Bradley's Meniere's
Disease did not meet Listing 2.07.  See ALJ Decision at 25, citing
Exhibit 1A, 3A (see R. 81, 97).  Consequently, the ALJ had medical
evidence in the record from which to make his determination that
Bradley's condition met or equaled Listing 2.07.

Bradley also argues that the ALJ should have given controlling
weight to Dr. O'Brien's opinion regarding Bradley's "functionality"
because Dr. O'Brien was her treating physician.  Pl.'s Mot. at 6.  A

treating physician's medical opinion is entitled to controlling weight when it is well supported by medically acceptable clinical and diagnostic techniques and is reasonably consistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2); SSR 96-2p.  When controlling weight is not given to the treating physician's opinion, the ALJ must determine the weight to give the opinion by looking at several factors, including the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the support for the opinion, the consistency of the opinion, and whether the treating physician's opinion is about a medical issue related to his area of specialty.  20 C.F.R. §§ 404.1527(c)(2)(i), (ii),  404.1527(c)(3)-(c)(6). "If the ALJ discounts the physician's opinion after considering these factors, [the court] must allow that decision to stand so long as the ALJ minimally articulated his reasons[.]"  Elder, 529 F. 3d at 415 (internal quotations and citations omitted).

Bradley argues that the ALJ improperly gave little weight to Dr. O'Brien's opinion on the ground that Dr. O'Brien did not treat Bradley for Meniere's Disease. Pl.'s Mot. at 6.  Bradley points out that Dr. O'Brien prescribed Bradley pills for water reduction.  Id. at

6-7.  However, the ALJ recognized that Dr. O'Brien prescribed a
water pill but concluded that Dr. O'Brien provided no other
treatment for Bradley's Meniere's disease, which justified giving
little weight to Dr. O'Brien's opinion.  The ALJ's conclusion is
supported by the record and provided a basis for discounting Dr.
O'Brien's opinion.  See Elder, 529 F.3d at 416 (finding that the
record supported the ALJ's decision refusing to afford the treating
physician's opinion controlling weight where the physician was not
a specialist in fibromyalgia and failed to conduct a thorough
examination of the claimant to determine the severity of her
conditions).

Moreover, the ALJ offered additional reasons for giving little
weight to Dr. O'Brien's opinions, and Bradley does not argue that
those reasons are unsound.  The ALJ explained that he discounted
Dr. O'Brien's opinion because the opinion rested, in part, on an
assessment of an impairment outside Dr. O'Brien's area of expertise
(Meniere's Disease).   This reason is supported by the record, as the
record shows that Dr. O'Brien is a general practitioner and not a
specialist in otology or neurotology.  See Elder, 529 F.3d at 416
(finding that the record supported the ALJ's decision refusing to

afford the treating physician's opinion controlling weight where the physician was not a specialist in fibromyalgia).

The ALJ also discounted Dr. O'Brien's opinion because Dr. O'Brien relied heavily on Bradley's subjective report of symptoms. The ALJ noted that the treatment records contained very little objective or clinic findings.  This reason is supported by the record. See Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) (noting that where the physician's clinical findings were negative, his opinions regarding the claimant's limitations were presumably based on the claimant's subjective complaints, and "medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints").

The ALJ further discounted Dr. O'Brien's opinion because the opinion was without substantial support from other evidence in the record.  The ALJ noted that Bradley reported hearing loss, but that a November 2013 examination recorded that Bradley was "negative for hearing problems."  R. 26.  The record supports this finding. See R. 347 (November 2010 medical record reflecting that Bradley's

hearing was good); R. 644 (November 2013 medical record indicating that Bradley was "negative for hearing problems").

Finally, the ALJ gave little weight to Dr. O'Brien's opinion because of the inconsistency between Dr. O'Brien's May 2013 Questionnaire and October 2013 Questionnaire without any corresponding treatment notes showing an increase in the frequency or severity of attacks from Meniere's Disease.  This conclusion is supported in the record.  See Denton v. Astrue, 596 F.3d 419, 424 (7th Cir. 2010) ("Even though a claimant's condition may worsen, a medical expert is obligated to point to objective medical evidence to explain the worsening prognosis").

In sum, the ALJ's decision to not give controlling weight to Dr. O'Brien's opinion was reasonable and the ALJ sufficiently articulated the reasons for his decision.  See Schmidt v. Astrue, 496 F.3d 833, 842-43 (7th Cir. 2007) (finding the ALJ provided an adequate explanation for his decision to not give controlling weight to the treating physician's medical opinion where the physician's diagnosis was not supported by medical evidence, statements in the treatment notes were inconsistent with the physician's conclusion that the claimant could not perform sedentary work, and the

questionnaire submitted by the physician appeared to have been drafted by the attorney and did not include new medical evidence or another basis to justify the more extreme limitations).

Bradley next argues the ALJ committed error by not giving any weight to the Meniere's journal submitted by Bradley. The journal consists of occasional entries by Bradley between September 2012 and November 2013 describing her symptoms on certain days. See R. 262-291. The information in the journal is similar to that contained in the Function Reports submitted by Bradley and Bradley's testimony, both of which the ALJ specifically considered.

An ALJ does not have to mention every piece of evidence, although he must provide a logical bridge between the evidence and his conclusions. Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009) (but also noting that the ALJ cannot ignore an entire line of evidence that is contrary to the ALJ's ruling). This is particularly true where the evidence is merely cumulative of evidence on which the ALJ relied. Jones v. Bowen, 699 F. Supp. 693, 696 n.4 (N.D. Ill. 1988). Here, the journal was merely cumulative of Bradley's Function Reports and testimony. Therefore, the ALJ did not err by failing to specifically mention the journal.

Finally, Bradley argues that the Social Security Administration must consider a claimant's medical conditions in combination. Pl.'s Mot. at 7. That is the extent of Bradley's argument. Therefore, the Court finds this argument forfeited. However, even assuming Bradley did not forfeit the argument, the record shows that the ALJ did consider the Bradley's medical conditions in combination. See R. 20 (considering Bradley's mental impairments singly and in combination); R. 27 (considering the combined symptoms and effects of Meniere's Disease, depression, fibromyalgia, and anxiety).

## VII. CONCLUSION

For the reasons stated, Plaintiff Satina Jo Bradley's Motion for Summary Judgment and Memorandum of Law in Support of Remand/Vacate of Decision Denying Disability (d/e 18) is DENIED and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 21) is GRANTED. The decision of the Commissioner is AFFIRMED. CASE CLOSED.

**ENTER:   June 6, 2016**

**FOR THE COURT:**

**s/Sue E. Myerscough**
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**